IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA.
CIVIL ACTION
BUSINESS LITIGATION DIVISION

ARTHUR GRIFFIN, JANICE SCOTT,
PHILLIP SCOTT, RAJSHAWN SCOTT,
DONNIE MALONE, SHEILA ALLEN,
THERESA ROBERSON, KENNETH SPINELLI,
HEATHER SPRAGUE, LUCILLE WALLS,
PAULETTE WASHINGTON
and JENESE WILLIAMS individually and
for all other persons similarly situated,

CLASS REPRESENTATION

**Plaintiffs**

Vs.

Case No. 07-12766 ~~07-1172038~~
Division: J

CAPITAL ONE BANK and
CAPITAL ONE SERVICES, INC.,

**Defendants.**

_____/

## FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Arthur Griffin, Janice Scott, Phillip Scott, Rajshawn Scott, Donnie Malone, Sheila Allen, Theresa Roberson, Kenneth Spinelli, Heather Sprague, Lucille Walls, Paulette Washington and Jenese Williams, individually and on behalf of all other persons similarly situated as defined below, bring this action based upon information and belief against Defendants Capital One Bank and Capital One Services, Inc., (referred to collectively herein as "Capital One" or "Defendants" or the "Company") and state and allege as follows:

EXHIBIT 2

1

## NATURE OF THE ACTION

1. This is a class action brought on behalf of two interrelated sub-classes of Florida consumers of Capital One credit cards:

   A. All residents of the State of Florida who (1) who were solicited by Capital One by mail and/or telephone; (2) who were marketed by Capital One for a Capital One "secured" credit card; (3) who received a "secured" credit card; (4) whose line of credit was $200 or less; and (5) whose "security deposit" was charged to the credit card ("Secured Credit Card Subclass"); and

   B. All residents of the State of Florida (1) who had concurrent, multiple credit card accounts with lines of credit of $1000 or less (2) and who paid a separate annual membership fee for each credit card account ("Duplicative Membership Fees Subclass").

This action is based in substantial part upon the Florida Deceptive and Unfair Trade Practices Act (hereinafter referred to as "FDUTPA"), as well as upon additional common-law and equitable causes of action.

2. Plaintiffs are among the thousands of Florida citizens who were targeted by Capital One as part of the Company's "subprime" credit card lending program. Capital One is the largest issuer of credit cards in the country with millions of cardholders and $12 billion in revenue in 2006. Despite the billions of dollars the Company earns from its operations, Capital One devised and executed the interrelated schemes described below to obtain concealed, unearned and unwarranted fees from consumers with low credit scores and/or impaired credit histories.

2

## PARTIES, JURISDICTION AND VENUE

3. Plaintiffs Arthur Griffin, Janice Scott, Phillip Scott, Rajshawn Scott, Donnie Malone, Sheila Allen and Theresa Roberson are all citizens of the State of Florida residing in Hillsborough County, Florida.

4. Plaintiffs Heather Sprague, Lucille Walls, Paulette Washington and Jenese Williams are all citizens of the State of Florida residing in Lee County, Florida.

5. Plaintiff Kenneth Spinelli is a citizen of the State of Florida residing in Citrus County, Florida.

6. The members of the proposed subclasses are residents of the State of Florida.

7. Defendant Capital One Bank is a limited purpose credit card bank chartered in Virginia. It maintains its corporate offices at 11013 West Broad Street Road, Glen Allen, VA 23060.

8. Defendant, Capital One Bank, is not qualified in the State of Florida, has not appointed a registered agent for service of process, therefore, pursuant to Florida Statute 48.181, has designated the Secretary of State of Florida as agent for service of process.

9. Capital One Services maintains its principal offices at 8000 Jones Branch Drive, McLean, Virginia 22102. Capital One Services is the sales and marketing arm of Capital One Financial and Capital One Bank.

10. Substantial acts which give rise to the causes of action asserted herein occurred in this State and within this venue.

11. Capital One has continuous and systematic contacts with this state through issuing secured and unsecured MasterCard and Visa credit cards, offering credit card loans, sending

monthly statements and selling products and services in Florida to Florida residents.

## FACTUAL ALLEGATIONS

12. On July 25, 2000, John D. Hawke, Jr., the United States Comptroller of the Currency sent "OCC Advisory Letter AL 2000-7" to all chief executive officers and compliance officers of all national banks such as Capital One. The subject of the advisory was "Abusive Lending Practices." The Advisory stated, in part:

> Examiners should be alert for the following indications that an institution may be engaging in abusive lending practices:
>
> - Targeting persons, such as the elderly, women, minorities, and persons living in low- or moderate- income areas, who are perceived to be less financially sophisticated or otherwise vulnerable to abusive loan practices;
>
> - Inadequate disclosure of the true costs and risks of loan transactions;
>
> - Lending practices that are fraudulent, coercive, unfair, deceptive or otherwise illegal;
>
> - Aggressive marketing tactics that amount to deceptive or coercive conduct;
>
> - Padding/Packing - charging customers unearned, concealed or unwarranted fees.

13. On March 7, 2007, before the Committee on Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations regarding Credit Card Practices: Fees, Interest Rates, and Grace Periods, the following testimony was given concerning these credit card marketing practices that are harmful to consumers:

Subprime credit cards.

- "Downselling" consumers by prominently marketing one package of

4

- credit card terms, but then approving consumers only for accounts with less favorable terms.

- Issuing credit cards with low credit limits, then adding mandatory fees or "security deposits" resulting in little or no available credit when the consumer receives the card.

- Deceptively marketing credit "protection" products.

- A single late payment on a "prime" credit card account may result in the imposition of a $35 fee and an increase in the APR from a reasonable 10% to a sky-high 28%. This account now bears the hallmarks of a subprime credit card — high rates and high fees.

### Capital One's Secured Credit Card Scheme.

14. As part of its "subprime" lending program, Capital One targeted consumers it identified as "subprime" borrowers. In doing so, the Company employed uniform marketing materials, which included direct mail solicitations and scripted telephone solicitations.

15. Each Plaintiff and member of the Secured Credit Card Subclass was targeted as a Capital One solicitation recipient because he or she was classified as a "subprime" borrower. A "subprime" borrower generally means a borrower that has a lower credit score or an impaired credit history. More particularly, Capital One, at the time of the credit card offers, defined a "subprime" consumer as a person having a FICO score of 550-720.

16. Plaintiffs and the putative Secured Credit Card Subclass were identified as targeted consumers through the Company's pre-screening process, a process which included a review of each consumer's credit information obtained from the three credit bureaus (Equifax, Experian and Trans Union). As identified "subprime" borrowers, Plaintiffs and members of the proposed Secured Credit Card Subclass were offered similar credit terms on certain Capital One credit cards.

5

17. Plaintiffs' experiences with Defendants are typical of that of each member of the putative Secured Credit Card Subclass.

18. Beginning on or after September, 2001, each Plaintiff received a credit card solicitation from Capital One via the mail. These solicitations informed Plaintiffs that they were "pre-approved" for a Capital One Bank credit card.

19. Although Plaintiffs have requested account documents from Capital One for the purpose of determining the exact date of the solicitations, Capital One has failed or refused to provide the requested documents, such as advertisements, mailings and account documents.

20. The direct mail solicitations received by Plaintiffs originated with, and were sent by, Capital One Services.

21. In conjunction with the direct mail solicitations described above and as part of Capital One's marketing plan, Plaintiffs were also solicited by Capital One Services via the telephone. The Company's telephone solicitors used a uniform script created by Capital One to persuade Plaintiffs to accept and activate a Capital One credit card. As part of the Company's scripted representations, the telephone solicitors stated that Plaintiffs would receive a line of credit that was "up to" $500.

22. The Company's representation of a line of credit "up to" $500 was false and misleading in that Capital One knew from its marketing research, review of the consumer's credit information, and its classification of the consumer as a "subprime" borrower that virtually no consumer in the targeted consumer market would qualify for a line of credit greater than $200.

23. Based on the representations contained in the Company's direct mail and telephone solicitations, Plaintiffs accepted and activated a "secured" Capital One credit card. Thereafter,

6

Plaintiffs received a "welcome to Capital One" letter indicating that their credit cards had been approved but no credit card was enclosed.

24. Capital One's "welcome letter" failed to state the credit limit that the Plaintiffs would receive. The "welcome letter" instructed Plaintiffs as follows: "Once your card arrives, simply call the toll-free number to activate it, *find out your initial credit line* and select your Personal Identification number (PIN)." (Emphasis added).

25. After receiving the credit card, Plaintiffs called Capital One to activate the cards. Immediately upon activating the credit cards, Plaintiffs were assessed undisclosed, hidden or misrepresented fees, including a $49 "security deposit" and an annual membership fee of $39 or more. By accepting the card, consumers also triggered the risk of late fees and additional charges should they fail to pay the charges in a time and manner dictated by Capital One.

26. None of the members of the putative Secured Credit Card Subclass knew the amount of their individual line of credit prior to activating their Capital One credit card.

27. It was not until sometime after they activated the credit cards that Plaintiffs and the members of the Secured Credit Card Subclass learned that their actual credit limits were only $200 or less.

28. Under the terms of the Capital One cardholder agreement, cardholders are required to pay all charges, including security deposits and membership fees, before a credit card may be terminated. Stated another way, a consumer who has activated a Capital One credit card but has not made a single purchase is prohibited from canceling the credit card without paying the Company's excessive charges. For example, upon activating a credit card with a purported $200 line of credit, the Company charged the consumer approximately $88 in start-up fees, depleting the line of credit

7

by 44%. Upon learning this information, however, a consumer was not allowed to cancel the card without paying Capital One's fees, even though the customer had never made a purchase on the card.

29. The fees and charges were conveyed to Plaintiffs and members of the Secured Credit Card Subclass in such a way that it was not possible for the customer to determine how charges and fees were triggered and calculated, or how payments were applied to charges. For example, the account statements provided by Capital One to the consumer do not indicate whether interest charges apply to the security deposit. Nor can a consumer determine the sequence or order in which consumer payments are applied to different charges. For example, if the consumer is charged for a "security deposit" and a membership fee, and makes a small credit purchase, and then makes a small payment (less than the total obligation), the consumer cannot tell how the payment is applied to the security deposit. The consumer cannot tell, for example, whether the payment is first applied to interest charges, late payment charges, principal amounts on credit purchases, or security deposits.

30. Upon information and belief, Plaintiffs allege that Capital One did not account for the "security deposit" funds internally as an actual security deposit, but treated the security deposition in the same manner for accounting purposes as fee income.

### Capital One's Duplicative Membership Fee Scheme.

31. Capital One routinely offered existing cardholders, including Plaintiffs and the members of the Duplicative Membership Fees Subclass a second (or even third) credit card. On information and belief, Capital One often offered additional cards to customers who were currently delinquent or "over limit" (exceeding their credit limit) on a Capital One card. Each of the multiple

credit cards had a low credit limit of $1000 or less. Capital One could have simply raised the customer's low credit limit but instead chose to offer a second card as part of its scheme to generate unearned, unwarranted and deceptive fees from "subprime" consumers.

32. Plaintiffs and the members of the Duplicative Membership Fees Subclass were charged a separate, duplicative annual membership fee for each credit card. On information and belief, the annual membership fee for each, individual card ranged from $29 to $72. The annual membership fee was nonrefundable even if the credit card was cancelled. The annual membership fee was in addition to a host of other fees and charges that Capital One charged on each credit card to cover certain costs of doing business and to provide certain services, including but not limited to: (a) finance charges, (b) "over limit" fees of $25 or more per month per card when balances exceeded the low credit limit, (c) past due fees of $25 or more per month per card, (d) return check fees of $29 or more per incident, (e) payment by phone fee of $10 or more per use of the service, (f) cash advance fee of $10 or more per advance, and (g) payment protection insurance premium of approximately .0088 percent of the balance. In addition to the duplicative membership fees, offering multiple cards -- rather than simply increasing the credit limit -- maximizes Capital One's fee income because when customers with multiple cards fall behind on payments they compile monthly "over limit" fees and/or past due fees on each card.

33. From time to time, Capital One also offers what it defines as "additional benefits and services" with the customer accounts such as worldwide toll-free assistance or warranty manager service. These "benefits and services" are described in a document entitled "Guide to Benefits." These "benefits and services" are also duplicative across multiple cards. In

the "customer agreement," Capital One reserves the right to adjust or delete unilaterally the benefits or services provided with the credit card.

## CLASS REPRESENTATION ALLEGATIONS

34. Plaintiffs repeat and reallege all preceding paragraphs of the Complaint and incorporate them here by reference. Pursuant to Rule 1.220(c) of the Florida Rules of Civil Procedure, Plaintiffs plead as follows:

35. Rule 1.220(b)(1)(A) of the Florida Rules of Civil Procedure applies to this action because "inconsistent or varying adjudications concerning individual members of the class which would establish incompatible standards of conduct for the party opposing the class". In addition, Rule 1.220(b)(3) applies to this action because "the questions of law or fact common to the claim or defense of the representative party and the claim or defense of each member of the class predominate over any question of law or fact affecting only individual members of the class, and class representation is superior to other available methods for the fair and efficient adjudication of the controversy."

36. Pursuant to Rule 1.220(c)(2)(D)(ii) of the Florida Rules of Civil Procedure, the definition of the alleged subclasses is as follows:

A. All residents of the State of Florida who (1) who were solicited by Capital One by mail and/or telephone; (2) who were marketed by Capital One for a Capital One "secured" credit card; (3) who received a "secured" credit card; (4) whose line of credit was $200 or less; and (5) whose "security deposit" was charged to the credit card ("Secured Credit Card Subclass");

B. All residents of the State of Florida (1) who had concurrent, multiple credit card

accounts with lines of credit of $1000 or less (2) and who paid a separate annual membership fee for each credit card account ("Duplicative Membership Fees Subclass").

The subclass definitions expressly exclude damages for any charges by Defendants which could reasonably be construed as being related to the amount of interest rates charged to consumers for credit purchases to the extent that such rates are regulated by federal banking laws. Excluded from the subclass are officers and directors of Defendants.

37. Pursuant to the requirements of Rule 1.220(c)(2)(D)(i) of the Florida Rules of Civil Procedure, Plaintiffs allege that the members of each subclass are so numerous that their joinder herein is impracticable. On information and belief, Plaintiffs believe the total number of members in each subclass to number in the thousands.

38. The precise number of Class members and their addresses are unknown to Plaintiffs but can be obtained from Defendants' records. Class members can be notified, if so ordered by the Court, by mail, supplemented by published notice, if deemed necessary.

39. Pursuant to the requirements of Rule 1.220(c)(2)(B) of the Florida Rules of Civil Procedure, Plaintiffs allege that questions of law and fact common to the Class as a whole predominate over any questions affecting only individual class members. Those common questions of fact and law include:

(a) Whether the consumers who were offered credit cards with security deposits charged to the initial credit card balances were targeted or identified by Capital One as subprime borrowers and marketed in the same manner;

(b) Whether the uniform mailings, telemarketing sales scripts and contracts used by Capital One personnel or third party marketers when marketing the "secured" credit cards were false or deceptive;

(c) Whether material facts were omitted, suppressed or concealed by Defendants in connection with the marketing and sale of the "secured" credit card;

(d) Whether the acts and practices of Capital One constitute unfair, deceptive or unconscionable acts and practices;

(e) Whether Defendants engaged in unfair, deceptive or unconscionable acts and practices by the use of "up to" marketing in which a consumer is offered a credit card with a line of credit "up to" $500 when Capital One knew, by pre-screening the consumers, that they would receive at best a $200 line of credit;

(f) Whether Defendants wrongfully mischaracterized fees or charges as "security deposits;"

(g) Whether Defendants engaged in unfair, deceptive or unconscionable acts and practices by telling the consumer that they were offering the consumer a $200 line of credit when in fact that line of credit was largely consumed by security deposits and other charges;

(h) Whether Defendants engaged in unfair, deceptive or unconscionable acts and practices by charging class members unwarranted and unearned annual membership fees on concurrent accounts;

(i) Whether Plaintiffs and class members suffered economic damages as a proximate result of the alleged unfair, deceptive or unconscionable deceptive acts and practices of Defendants and the amount of such damages;

(j) Whether Defendants and were unjustly enriched by the unfair, deceptive or unconscionable acts and practices; and

(k) Whether Plaintiffs are entitled to an award of punitive damages.

40. Pursuant to Rule 1.220(c)(2)(C) of the Florida Rules of Civil Procedure, Plaintiffs allege that their claims are typical of the claims of each subclasses they represent. The particular facts and circumstances that show the claim of each representative party is typical of the claim of each subclass member as set forth above.

41. Plaintiffs adequately represent the subclasses because their interests are common with other Class members, because the Plaintiffs and the class members were commonly harmed by the same conduct and actions of Defendants, and because Plaintiffs' interests are not in conflict with the interests of the other Class members.

42. The attorneys for Plaintiffs are experienced and capable in both complex civil litigation and class actions.

43. A class action is superior to other available means for the fair and efficient adjudication of this controversy. The damages suffered by individual Class members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendants' conduct.

44. Class action treatment of this litigation is superior to individual litigation because it would be virtually impossible for the members of the Class individually to effectively seek redress

for the wrongs done to them individually. Even if Class members could individually afford such litigation, which many cannot, the court system would be excessively burdened, given the size of the Class. In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from the relatively complex legal and factual issues of the case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

45. Pursuant to Rule 1.220(c)(2)(E), the particular facts and circumstances that support the conclusions required by the court in determining that the action may be maintained as a class action as alleged herein are set forth above.

## COUNT ONE
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
## (BUSINESS AND COMMERCE CODE SECTION 501.201 et seq.)

46. Plaintiffs repeat and reallege all paragraphs of the Complaint.

47. By bringing this action, Plaintiffs herein act as a private Attorney General for their own benefit and for the benefit of the general public.

48. Each Plaintiff is a party engaged in consumer commerce in Florida who has been affected by Defendants' unfair business practices.

49. Defendants' conduct constitutes false, misleading and/or deceptive practices within the meaning of the Florida Deceptive and Unfair Trade Practices Act, Section 501.204(1), Florida Statutes.

50. Defendants' conduct constitutes unconscionable acts pursuant to section 501.204(1), Florida Statutes.

51. Defendants' conduct is further proscribed by section 501.2075, 501.2077(2), 501.2105, Florida Statutes.

52. Plaintiffs seek judicial orders of an equitable nature against Defendants, including, but not limited to, orders declaring Defendants' practices as alleged to be unlawful, unfair, unconscionable and/or deceptive, and enjoining Defendants from undertaking any further unlawful, unfair, unconscionable and/or deceptive acts or omissions.

53. Plaintiffs and the Class seek disgorgement and restitution plus interest on damages at the legal rate, as well as three times the amount of their economic damages based on Defendants' knowing and intentional violations of this statute.

54. Because Plaintiffs seek to enforce an important right affecting the public interest, Plaintiffs request an award of attorneys' fees and costs on behalf of themselves and the Class.

55. As a result of Defendants' violations of the Florida Deceptive and Unfair Trade Practices Act prohibiting unfair and deceptive acts and practices, Plaintiffs and members of the Class have suffered monetary damages for which Defendants are liable.

## COUNT TWO
## UNJUST ENRICHMENT

56. Plaintiffs repeat and reallege all preceding paragraphs of this Complaint and incorporate them here by reference.

57. In seeking to sell credit cards to Plaintiffs and members of the Subclasses, Defendants withheld material terms from consumers prior to card activation, including the actual amount of the available line of credit and the true nature of the fees and charges.

58. Defendants were unjustly enriched by the practice of withholding material terms of the credit card agreement until the card was activated and fees and charges and "deposits" were charged to the customer.

59. Defendants were unjustly enriched by forcing credit terms upon consumers and by forcing consumers to pay fees, charges, penalties and/or "security deposits" to cancel the credit card, using such tactics as threats both express and implied to adversely harm the consumer's credit rating. Such acts were unconscionable.

60. Defendants were unjustly enriched by forcing the Plaintiffs and class members to pay for services either never provided, or services that were no longer provided after the customer cancelled the credit card.

61. Defendants were unjustly enriched by charging Plaintiffs and Class members unearned, unwarranted and duplicative membership fees.

62. As a result of Defendants' actions which constitute unjust enrichment, Plaintiffs and class members suffered actual damages for which Defendants are liable. Defendants' liability for such damages should be measured by the extent of Defendants' unjust enrichment.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray:

A. That the Court determine that this action may be maintained as a class action under Rule 1.220 of the Florida Rules of Civil Procedure, that Plaintiffs are proper class representatives,

and that the best practicable notice of this action be given to members of the Class represented by Plaintiffs;

B. That judgment be entered against Defendants and in favor of Plaintiffs and the Class on Counts One and Two as alleged in this Complaint, including awards of actual, compensatory and punitive damages in an amount to be determined at trial;

C. That judgment be entered imposing interest on damages, litigation costs and attorneys' fees against the Defendants; and

D. For all other and further relief as thus Court may deem necessary and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury consisting of twelve persons on all issues so triable.

Dated this 13th day of December, 2007.

Respectfully Submitted,

Kevin McLaughlin
WAGNER, VAUGHAN, McLAUGHLIN &
BRENNAN, P.A.
601 Bayshore Boulevard
Suite 910
Tampa, FL 33606
(813) 225-4000


Brent Walker
CAULEY BOWMAN CARNEY &
WILLIAMS, PLLC
P.O. Box 25438
Little Rock, AR 72221-5438
(501) 312-8500

Steven A. Owings
OWINGS LAW FIRM
1320 "D" Brookwood
Little Rock, AR 72202
(501) 661-9999

**Attorneys for the Plaintiffs**